IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANQUIN ST. JUNIOUS,

    Plaintiff,

v.

SERGEANT HARTMAN,

    Defendant.

OPINION & ORDER

15-cv-344-slc

---

*Pro se* plaintiff AnQuin St. Junious is proceeding on an Eighth Amendment claim against Sergeant Lee Hartman for Hartman's alleged failure to protect him from harm when he included a confidential statement made by St. Junious in a conduct report issued to other inmates. On January 27, 2018, Hartman, filed a Motion for Summary Judgment. (Dkt. 18.) St. Junious failed to meet his February 27, 2017 deadline to submit his opposition materials. On March 8, 2017, St. Junious filed a letter (dkt. 22) requesting an extension past March 24, which I granted, allowing him until April 7, 2017, to oppose the motion (dkt. 23). It is now June 5, 2017 and St. Junious has not filed anything at all. As a result, I have taken Hartman's motion under advisal based on the record currently before the court. For the following reasons, I am granting Hartman's motion for summary judgment.

UNDISPUTED FACTS[1]

In May 2014, AnQuin St. Junious was in State custody at the Chippewa Valley Correctional Treatment Facility (CVCTF) where Correctional Sergeant Lee Hartman worked. Hartman was responsible for the general supervision and treatment of inmates, which include

---

[1] Unless otherwise noted, these facts are material and undisputed. The facts are drawn from the defendants' proposed findings of fact, as well as underlying evidentiary support submitted by both sides, all viewed in the light most favorable to St. Junious as the non-movant.

hiring inmates for their work positions. While at CVCTF, St. Junious often volunteered information about other inmates to Hartman in hopes of improving his job opportunities, or moving up his Earned Release Program Date. Hartman never engaged St. Junious as a confidential informant, but whenever St. Junious gave him information, Hartman would forward it to his supervisor.

At some point in May of 2014, St. Junious told Hartman about another inmate's plan to drop drugs and tobacco at CVCTF's parking lot after his release. Hartman asked him to write a statement about what he knew, and St. Junious agreed. In his statement, St. Junious wrote that two inmates at CVCTF, Lane Caskey and Joshua Hawkins, were involved in the contraband scheme. Hartman forwarded St. Junious's statement to his supervisor and did not take any other action related to that statement. Hartman did not believe that St. Junious's written statement contained confidential material. (In his complaint, St. Junious alleges that he believed that his name would not be subsequently used in an investigation about the alleged scheme, but no evidence suggests that St. Junious and Hartman discussed whether his name would be kept confidential.)

Based on St. Junious's statement, two investigations commenced. The first investigation looked into St. Junious himself because his written statement included the admission that he was planning to set up an inmate with a fake drug deal. On May 22, 2014, St. Junious was placed in the Temporary Lock-up Unit (TLU), which is a routine placement that takes place when staff is investigating an issue involving an inmate. An inmate placed in TLU is housed in a cell by himself and segregated from other inmates.

Officer Fliehr, a CVCTF employee, conducted that investigation and issued St. Junious a conduct report. Hartman delivered the conduct report to St. Junious's TLU cell on June 10, 2014. Following a disciplinary hearing that day, Lieutenant Goettl found St. Junious guilty of violating Wis. Admin. Code § DOC 303.32A and sentenced him to 60 days of disciplinary separation in the restrictive housing unit. That conduct report is not related to St. Junious's claim in this lawsuit, but it is undisputed that Hartman was not involved in that investigation, in the decision to issue that conduct report, in the subsequent disciplinary hearing, or the decision to punish St. Junious. It is further undisputed that St. Junious continued to be segregated from other inmates throughout that investigation and following his disciplinary hearing.

Lieutenant Wellington, another CVCTF employee, conducted the investigation into St. Junious's statements inculpating Caskey and Hawkins. Wellington prepared and issued two conduct reports: on June 11, 2014, he issued one to Caskey for violating Wis. Admin. Code § DOC 303.47A, Possession of contraband-miscellaneous-attempt, and Wis. Admin. Code § DOC 303.47C, Possession of Contraband-miscellaneous-conspiracy. (Dkt. 21-2.) On June 12, 2014, Wellington issued a conduct report to Hawkins for violating Wis. Admin. Code § DOC 303.47C (Possession of Contraband –miscellaneous). Both inmates were placed in TLU pending a hearing on the conduct reports.

On June 12, 2014, Hartman delivered to Caskey and Hawkins their respective conduct reports. St. Junious's written statement was *not* attached to either conduct report, but Wellington included in his reports St. Junious's name and the information that he had provided in his written statement. (*Id.*) Wis. Admin. Code. § DOC 303.84(5), provides that if the security director

concludes that testifying would pose a risk of harm to a witness, the hearing officer may consider confidential statements signed under oath from that witness without revealing the witness's identity. This was a decision to be made by officers higher in the chain of command than Hartman. In other words, Hartman was not responsible for deciding and did not have authority to decide whether to treat St. Junious's information as confidential in the conduct reports or at the disciplinary hearings that followed. At some point, St. Junious's written statement was made available to Caskey and Hawkins. Hartman had nothing to do with this decision.

At Hawkins's June 18 2014 hearing, he was found guilty of the charges in the conduct report and was sentenced to 60 days of disciplinary separation in the restrictive housing unit. At Caskey's June 19, 2014 hearing, he also was found guilty and also was sentenced to 60 days of disciplinary separation. Records of these hearings indicate that St. Junious testified at Caskey's hearing but did not testify at Hawkins's. (*See* dkt. 21-2, at 13; dkt. 21-3.) Neither Hawkins nor Caskey were released from the restrictive housing unit between the time they received their conduct reports and when they began serving their respective 60-day sentences. Hartman was not involved in either disciplinary hearing process, and he has no authority to conduct such hearings or to mete out punishment.

On June 19, 2014, St. Junious was transferred to Stanley Correctional Institution (SCI). Hartman was not involved in the decision to transfer him, nor was Hartman involved in St. Junious's placement at SCI. At SCI, St. Junious learned that Caskey and Hawkins knew about his written statement. According to St. Junious' complaint, which Hartman does not contradict, Caskey and Hawkins are associated with the "Latin Kings and 'Native American' tribes." While St. Junious was outside of Unit 4 at SCI, two Latin Kings hemmed him in at a picnic table. They

4

made him read his statement and told St. Junious to "get the fuck out of Stanley Correctional Institution before they break [his] neck or stab [him]." (Compl., dkt. 1, at 5.)

After this confrontation, St. Junious asked to be placed in safe custody; he was moved to segregation until he was transferred to Jackson Correctional Institution (JCI). According to St. Junious, inmates at JCI also saw his written statement. After St. Junious filed a complaint, staff at JCI placed a mail check on all incoming mail to search for copies of the conduct reports or St. Junious's confidential statement. Staff at JCI took no additional security steps because St. Junious reported that he was okay residing at JCI. No one ever laid hands on St. Junious, but he asserts in his complaint that "My mental health has gotten Bad from this intentional act against my safety." Dkt. 1 at 9.

OPINION

St. Junious claims that Hartman's use and dissemination of St. Junious's confidential statement violated his rights under the Eighth Amendment, imposes a duty on "those charged with the high responsibility of running prisons … 'to protect prisoners from violence at the hands of other prisoners.'" *Santiago v. Walls*, 599 F.3d 749, 758 (7th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). That said, however legitimate St. Junious's fears of an assault may have been, "it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eight Amendment." *Babcock v. White*, 102 F.3d 270, 272 (7th Cir. 1996). Actual physical injury is not a filing prerequisite, however: A prisoner may seek injunctive relief and nominal or punitive damages where "[p]rison officials recklessly expose a prisoner to a substantial risk of a serious physical injury." *Smith v. Peters*, 631

F.3d 418, 421 (7th Cir. 2011); *see also Turner v. Pollard*, 564 Fed. Appx. 234, 238-39 (7th Cir. 2014) ("where . . . the record supports an inference that a prison official is deliberately exposing an inmate to a dangerous risk, the inmate may seek an injunction against exposure to the risk."). Hartman moved for summary judgment on the grounds that: (1) he lacks sufficient personal involvement to be liable; (2) St. Junious never faced a substantial risk of serious harm because DOC staff responded appropriately to his concerns; and (3) qualified immunity shields Hartman from liability. I agree that Hartman's personal involvement was insufficient to warrant liability under § 1983. Additionally, I conclude that qualified immunity protects him from liability.

**(1) Hartman's Personal involvement**

Hartman argues that he cannot be held liable in this action because he did not take any part in the alleged constitutional violation. *See, e.g., Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010) (individual liability under § 1983 requires personal involvement). Hartman is correct.

Hartman has submitted uncontradicted evidence that he did not participate in creating or issuing the conduct reports to Hawkins and Caskey. Hartman's involvement ended when he passed St. Junious's written statement on to his supervisor, Lt. Wellington. Therefore, Hartman did not actually cause St. Junious's name to be disclosed. Next, there is no support for the notion that Hartman *should* have known that St. Junious's name would be disclosed to other inmates, which might give rise to a claim that Hartman acted in recklessness disregard for St. Junious's safety. There is no evidence suggesting either that Hartman knew that Lt. Wellington would include St. Junious's name included in the conduct reports, or that Hartman had some control

6

over whether to exclude St. Junious's name in the conduct reports. To the contrary, Hartman has represented that he had nothing to do with preparing or issuing the conduct reports against Hawkins and Caskey other than delivering copies of the reports after they were filed. Accordingly, Hartman did not take any action that compromised St. Junious's safety, so his involvement in creating the risk of harm was not sufficient for § 1983 liability.

### (2) Risk of Harm to St. Junious

It is a stretch for Hartman to argue that St. Junious was *never* subjected to a substantial risk of serious harm. True, St. Junious was never in danger at CVCTF because he remained in segregation from May 22, 2014 until his June 19, 2014 transfer to SCI. But St. Junious's experience at SCI was different: he was not immediately placed in segregation and two inmates confronted him with a copy of his written statement, then threatened to mess him up. Staff at SCI promptly responded to St. Junious's complaint by placing him in segregation until he was transferred to JCI, where St. Junious concedes that did not receive any more threats. So, the use of St. Junious's statements in the proceedings against Hawkins and Caskey did create a risk of harm during the short period that St. Junious was not in segregation at SCI.

This being so, it does not rescue St. Junious's claim against Hartman from summary judgment. As already noted, Hartman cannot be held responsible for any resulting risk of harm to St. Junious because he did not cause St. Junious's statement to be disclosed, and he had absolutely no control over how the decision makers at SCI chose to treat St. Junious following his transfer from CVCTF.

## II. Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In this case, Hartman commemorated St. Junious's allegations against Hawkins and Caskey, then routed this information up the chain for his superiors to use as they saw fit. It was up to these higher-ranking officers to determine whether St. Junious's allegations exposed him to a risk of harm and if so, to ensure his safety. This was completely out of Hartman's hands. In these circumstances, Hartman did not violate–could not have violated–any of St. Junious's clearly established statutory or constitutional rights. Accordingly, if it were to matter, then Hartman would be entitled to qualified immunity.

## ORDER

IT IS ORDERED that defendant Lee Hartman's Motion for Summary Judgment (dkt. 28) is GRANTED.

The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 5th day of June 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge